IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FINNSUGAR BIOPRODUCTS, INC., an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) | Civil Action No. 97 C 8746 |
| vs. | ) ) | Hon. Judge Coar |
| THE AMALGAMATED SUGAR COMPANY, LLC, an Idaho Corporation; and ARI, an Idaho Corporation, | ) ) ) ) | Magistrate Judge Rosemond |
| Defendants. | ) ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION FOR RECONSIDERATION**



FILED

SEP 24 2001

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Dated: September 24, 2001

Rhett Dennerline
Greg Smith
COMPETITION LAW GROUP LLC
120 South State Street
Chicago, Illinois 60603



Finnsugar incorrectly asserts that the Court "should vacate its March 28 Opinion" based on *Group One*. The Court's Opinion is in harmony with *Group One*, which reinforces it.

## I. *GROUP ONE* DOES NOT ALTER THIS COURT'S RULING

*Group One* reversed a finding of an "on-sale" bar because the communications at issue were "indefinite" and "lack[ed] specific terms such as price and quantity" to Hallmark. Group One v. Hallmark, 254 F.3d 1041, 1047 (Fed. Cir. 2001). *Group One* recognized the holding of an earlier opinion, RCA v. Data General, 887 F.2d 1056, 1062 (Fed. Cir. 1989), that a proposal qualified as a definite offer, but rejected what it characterized as dicta, specifically language in *RCA* that activity need not "rise to the level of a formal 'offer' under contract law to trigger the on sale bar."[1] *Group One* stated that the on-sale bar requires "an offer to sell as understood in general commercial transactions" and an "offer must meet the level of an offer in the contract sense, one that would be understood as such in the commercial community." Group One, supra at 1047. The on-sale bar, of course, remains guided by § 102(b) and *Pfaff's* two-part test.

Contrary to Finnsugar's assertion, this Court's ruling based on the undisputed facts fits squarely within the requirements of *Group One:* "The transaction at issue undisputedly was a 'sale' *in a commercial law sense.*" (Opin. at 9.) This Court held that the "proposals made by Finnsugar to install the M9B3 process at SMSC Renville plant, before the critical date . . . *qualify as commercial offers for sale.*" (Id. at 12.)[2] Consistent with *Group One,* this Court cited authority on contract formation: "In this case, Finnsugar offered to install the M9B3 process at SMSC's Renville plant, prior to the critical date, in order to increase commercial prospects for itself as well as SMSC. 'It is well settled that a sale is a contract between parties to give and to pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold.' In re Caveney, 761 F.2d 671, 676 (Fed. Cir. 1985)." (Id. at 9.)

---

[1] This Court did quote that same language from *RCA,* but unlike the district court in *Group One,* did not "rely heavily" on it, id. at 1046, nor did this Court rest its holding on *RCA's* dicta.

[2] A "commercial offer" is satisfied by "offering" for sale a process. D.L. Auld Co. v. Chroma Graphics Corp., 714 F.2d 1144, 1148 (Fed. Cir. 1983); Scaltech v. Retec/Tetra, 178 F.3d 1378, 1999 U.S. App. Lexis 11941, *13 (Fed. Cir. 1999). Proposing to implement a process can be an offer "for sale." E.g., id.

1

Finnsugar also misconstrues the meaning of this Court's observation that there was no "explicit" offer to "sell" the patent or M9B3 process. (Opin. at 8.) That observation does not alter the conclusion that Finnsugar made a commercial offer through its communications with SMSC. Nothing in *Group One* or contract law requires the words "I offer to sell" or "sell" to communicate an offer. As *Group One* stated: "Courts are quite accustomed to and comfortable with determining whether a particular communication or series of communications amounts to an offer in the contract sense." Group One, supra at 1047. That is what the Court did here.

Undisputed evidence demonstrated Finnsugar made a "commercial offer." Here, parties went well beyond the preliminary and "indefinite communications" of *Group One*. For instance:

- There were repeated *"proposals"* by Finnsugar to implement the invention at SMSC for a ***commercial*** purpose. (Opin. at 2, 3, 4, 9, 12.)

- In December 1993, Finnsugar sent SMSC a draft amendment to the 1989 contract to agree to install the "Improvements." (DTX 72; Opin. at 3-4.)

- Inventor Hyoky testified that the "Improvements" in Exhibit A of the proposed amendment referred to "the M9B3 configuration." (Hyoky Dep. 225-26; see Plf's LR 56.1(b)(3) Resp. on § 102(b) at ¶ 45) (fact not disputed).

- Hyoky, as was promised in the December proposed amendment, followed up with a description of "Improvements" (i.e., M9B3) in January. (DTX 75; Opin. at 4.)

- SMSC formally rejected the "Finnsugar proposal" in a letter. (DTX 77.)

Finnsugar, in careful wording, makes the immaterial point that the January Report was not an offer "to either sell the process, sell the equipment, or install the equipment." (Finn. Br. at 3.) It ignores that the Report was part of a pending proposal to install the invention itself (M9B3), following on the heels of the proposed amendment. The Report detailed an M9B3 process specifically tailored for SMSC by "[r]e-grouping the present columns to include nine columns for molasses separation (one . . . for sucrose polishing), and three for additional betaine separation" (DTX 75 at pg. 15), including a detailed material balance chart (id. at F36641), another recommendation and payback numbers. (DTX 75; Opin. at 4.)[3] Just because Finnsugar was

---

[3]Finnsugar also had a process step description in a December 1993 report. (Opin. at 3; DTX 73, 103.)

2

offering SMSC use of valuable technical and financial information, and to install the process (for its own financial gain) by rearranging existing equipment, rather than offering to sell new equipment, does not mean that the transaction was any less a commercial offer.

Finnsugar also argues on the false premise that "installation of the M9B3 process would not provide it with any new consideration." (Finn. Br. at 5.) To the contrary, new consideration included at least an increased length of its benefits from a fixed date to "perpetuity" and increased betaine quality it received as payment from (45% to 85%). With a promised installation, Finnsugar was to reap significant financial gain with the promised higher quality betaine as payment in-kind for the third and fourth installment payments (valued at $"1 million"). (DTX 72, SMB201121, ¶ 1; id. 3rd recital) (Finnsugar "willing to continue to accept payment . . . provided that the quality of the betaine rich fraction delivered can be improved"). The amendment contained the essential terms of the transaction offered: the parties, new lengthened term ("perpetuity"), quantity (all output, per the 1989 contract), new quality ("85%"), and new price of output ($400/ton, etc.) (DTX 72, ¶¶ 6, 9, 10 and Exs.) that were to amend the prior contract that had numerous pre-known terms. (DTX 48.)

As Monten stated in the cover to the amendment, after referring to update of accounting information, "otherwise *I hope you agree* to the *form and content* of the Amendment." (DTX 72) (No comment or change was made to it prior to its rejection.) The amendment itself constituted a pending commercial offer with its essential terms that "manifested a willingness to enter into a bargain," particularly in view of the pre-known 1989 contract terms and description of the Exhibit A "Improvements" provided in January (M9B3). Hyoky Dep. supra; DTX 75.[4]

---

[4]Venture Assoc. v. Zenith Data Sys., 812 F. Supp. 788, 791 ("initial draft agreement...represent[ed] an offer"; draft response "a counteroffer"), aff'd in part; rev'd on other grnds, 987 F.2d 429 (7th Cir. 1993); Tibor Machine v. Freudenberg-nok Gen. Partner., 967 F. Supp. 1006, 1011 (N.D. Ill. 1997) (defendant asserts "'draft' documents cannot create contractual obligations" but "has not demonstrated that no set of facts exists under which [a] 'bundle' of documents can be construed as an offer"); Nat'l Gas Appl. v. The Manitowoc Co., 311 F.2d 896, 898 (7th Cir. 1962) (draft agreement an offer). An offer with essential terms is sufficient for a "definite offer." AO Svitanak v. Elexon, Ltd., 1998 U.S. Dist. Lexis 15873, *58 (N.D. Ill. 1998) ("contract may be enforced even though some contract terms may be missing or left to be agreed upon"); Teachers Ins. & Ann. Assoc. v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987); Williston on Contracts § 28; Corbin on Contracts § 30; Restatement (2nd) on Contracts § 26.

3

Also, as *Group One* states, "a particular communication or *series of communications*" can amount to a commercial offer. Group One, supra at 1047. There is no dispute that Finnsugar engaged in repeated in-person and written proposals to get SMSC to accept its bargain. (Opin. at 2, 3, 4, 9, 12.) Zitterkopf believed he was considering and rejecting proposals to implement the process. (Id. at 3.) If an offer was not outstanding, why did he take the step to send a rejection (to "Finnsugar proposal") in writing? (DTX 77.) Lake Co. Forest Prsv. v. Reliance, 329 N.E.2d 344 (Ill. App. 1975) (defendant "believed an offer had been made as evidenced by" its rejection letters). This Court properly addressed "these communications with SMSC." (Opin. at 8.)

## II. THIS CASE STILL IS NOT LIKE *MAS-HAMILTON*

As an initial matter, contrary to Finnsugar's assertion, this Court did not distinguish *Mas-Hamilton* on the grounds that "it was no longer the law." The Court considered and found it "not specifically instructive in the instant case." (Opin. at 11.) The "offers [in *Mas-Hamilton*] were not offers to sell the potential invention but rather were negotiations over the rights in the potential invention. In this case, Finnsugar offered to install the M9B3 process at SMSC in order to gain a return." (Id. at 11-12.) *Mas-Hamilton* is simply inapposite.[5]

Finnsugar takes liberty in quoting Judge Lourie (whose dicta on *Mas-Hamilton* is from "Additional Remarks" not a "concurring opinion"). Judge Lourie remarked on the sales of devices not processes, and to apply his dicta mechanically to an offer on a process, as here, is improper. For instance, it cannot be the law, as Finnsugar advances through a cropped quote of Judge Lourie that "the sale itself is the commercialization that starts the on-sale clock running." It is rote law that an offer ***alone,*** not a completed sale nor commercial use, is sufficient commercialization to start the on-sale clock; to accept otherwise contradicts § 102(b) and Federal Circuit precedent. UMC Elec. Co. v. United States, 816 F.2d 647, 653 (Fed. Cir. 1987) (bar

---

[5] As *Group One* states at 1049, the key distinction is: "a sale of rights in a patent, as distinct from a sale of the invention itself." Only the former potentially avoids the bar. That a sale includes a license does not except it from the on-sale bar; sales of patented products expressly or inherently include a license to rights. *Group One* recognized this false argument, and such "labeling" does not control: "Of course, a sale of an interest that entitles the purchaser to possession and use of the machine, unrelated to any patent present or future, could be couched as a 'license'; *such labeling would not prevent the transaction from triggering the on-sale bar, all other requirements being met."* Id. at 1049, n2.

4

invoked "whether the offer is accepted or rejected") (several citations). What is material is that Finnsugar made an offer prior to the critical date, not that physical installation may have been completed later. STX, LLC v. Brine, Inc., 211 F.3d 588, 590 (Fed. Cir. 2000) ("fact that delivery was set for dates after the critical date *is irrelevant* to the finding of a commercial offer to sell").[6]

Finnsugar also takes contradictory positions on its license excuse. On the one hand, Finnsugar states that SMSC already had a license to M9B3 (Finn. Br. heading IV), but then argues that the M9B3 offers are exempt from the on-sale bar because they were offers to license. (Id. at 4.) If M9B3 was already licensed, that simply confirms, *a fortiori,* that the proposed transaction that M9B3 be installed could not have concerned a mere license, and *Mas-Hamilton* is inapposite. In any event, the proposed amendment to SMSC on its face shows that it was not a mere offer to grant rights to a patent, but to get agreement to install the process itself: "SMSC *shall install* the improvements . . . to the Plant." (DTX 72, ¶ 2.) As stated above, in exchange for the agreed installation, Finnsugar was to gain substantially.

"The overriding concern of the on-sale bar is an inventor's attempt to commercialize his invention beyond the statutory term." STX, supra at 590. Finnsugar did exactly this, at least nearly six months prior to the critical date. The purpose of its deal was not simply a license; a bare license to SMSC (waiving of rights under a patent), would not have required action on SMSC's part and not advanced Finnsugar's commercial interests. Finnsugar, instead, proposed a bargain where SMSC was not just licensed, not just provided technical and investment specifications, but SMSC was to agree to in fact install the process for Finnsugar's financial gain.

Dated: September 24, 2001

Respectfully submitted,

Rhett Dennerline
COMPETITION LAW GROUP LLC
120 South State Street
Chicago, Illinois 60603

---

[6]Finnsugar also is incorrect that the installation period was unknown. The proposed amendment stated that it "shall" be installed and "completed not later than September 30, 1994." (DTX 72, ¶ 2.)

5

## Certificate of Service

I hereby certify that the foregoing instrument was served via U.S. Mail upon the following counsel of record on September 24, 2001:

>Eric C. Cohen
>Robert B. Breisblatt
>Thomas W. Tolpin
>Welsh & Katz, Ltd.
>120 South Riverside Plaza
>Chicago, Illinois 60606

Attorneys for Plaintiff Finnsugar Bioproducts, Inc.