# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 97 C 8746 | DATE | 3/25/2002 |
| CASE TITLE | Finnsugar Bioproducts vs. The Amalgamated Sugar Company, LLC, and Amalgamated Research, Inc. | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, the plaintiff's motion for reconsideration, or in the alternative to certify the issue for appeal, is hereby DENIED. [Doc. #s 133-1, 133-2].
(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | MAR 26 2002 | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 26 2002 date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | 155 |
| | Copy to judge/magistrate judge. | 02 MAR 25 PM 1:11 | | |
| vg(lc) | courtroom deputy's initials | FILED-FED-IO | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | |
|---|---|
| Finnsugar Bioproducts, Inc., an Illinois Corporation ) ) ) ) | |
| Plaintiff, ) ) | No. 97 C 8746 |
| v. ) ) | HONORABLE DAVID H. COAR |
| The Amalgamated Sugar Company, LLC, and Idaho corporation; and Amalgamated Research, Inc., an Idaho corporation, ) ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Finnsugar Bioproducts, Inc. ("Finnsugar" or "plaintiff") brought a claim against the Amalgamated Sugar Company, LLC and Amalgamated Research Inc. (collectively "SMSC" or "defendant") for infringement of U.S. Patent No. 5,795,398 ("the '398 patent"). In a Memorandum Opinion and Order issued on March 28, 2001 ("Order") this court granted the defendant's motion for partial summary on judgment on the basis that the '398 patent violates the "on sale" bar of the Patent Act, 35 U.S.C. § 102(b). Presently, Finnsugar's moves for reconsideration of this court's Order in view of the Federal Circuit's decision in Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041 (Fed. Cir. 2001), or in the alternative, moves to certify the issue for appeal.

1



## Standard of Review

Motions for reconsideration serve a "limited function: to correct manifest errors of law or fact or to present newly discovered evidence." Keene Corp. v. International Fidelity Ins. Co., 561 F.Supp. 656, 665-66 (N.D.Ill.1982), aff'd 736 F.2d 388 (7th Cir.1988). Accordingly, a court will entertain a motion for reconsideration only where "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1191 (7th Cir.1990) (quoting Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D.Va.1983)).

Patent invalidity must be proven by clear and convincing evidence. Tec Air, Inc. v. Denso Mafg. Michigan Inc., 192 F.3d 1353, 1358 (Fed. Cir. 1999); Envirotech Corp. v. Westech Engineering Inc., 904 F.2d 1571, 1574 (Fed. Cir. 1990). "Clear and convincing evidence has been described as evidence which proves in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions are [sic] 'highly probable.'"" Intel Corp. v. U.S. Intern. Trade Comm'n, 946 F.2d 821, 830 (Fed. Cir. 1991) (quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984)).

Under 35 U.S.C. § 282, a patent is presumed valid and one challenging its validity bears the burden of proving invalidity by clear and convincing evidence. Innovative Scuba Concepts, Inc.v. Feder Indus., Inc., 26 F.3d 1112, 1115 (Fed.Cir.1994); Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed.Cir.1986). While a patentee has the burden of going forward with rebuttal evidence once a challenger has presented a prima facie case of invalidity, the presumption of validity remains intact and the ultimate burden of proving invalidity remains

with the challenger throughout the litigation. Id.

**Background**

The plaintiff brought this action against the defendants for infringement of the '398 Patent. Defendants submitted a motion for summary judgment arguing that the '398 Patent was invalid under the "no sale bar" of the Patent Act. This court found in its Memorandum Opinion and Order that Finnsugar's actions did, in fact, trigger the on sale bar of the Patent Act, thereby rendering the '398 Patent invalid.

On December 14, 1992, Finnsugar and SMSC entered into an "Acceptance Agreement," which recited that the guarantees had not been satisfied, and which provided for a Joint Research Project "to enhance and improve the separation technology at the Plant." (Plf's LR 56.1(b)(3) Resp. on § 102(b), ¶9.) The stated objective was to "find improvements related to the process in order to improve the profitability level of the plant in normal operation." The activities were to take place "for a period of one year" and were to "be completed no later than March 15, 1994." (DTX 59.) The Joint Research Project was to be headed by one SMSC scientist, Jean-Pierre Monclin ("Monclin"), and one Finnsugar scientist, Goran Hyoky ("Hyoky"). SMSC's main concern was increasing sucrose purity. ( Plf's LR 56.1(b)(3) Resp. on § 102(b), ¶¶13-15.)

On March 23, 1993 inventor Hyoky generated a "process flow scheme and material balance for separation of betaine at Renville" stating "Finnsugar Engineering is preparing a proposal for installing this process." (Plf's LR 56.1(b)(3) Resp. on § 102(b), ¶ 24.) Inventors Hyoky and Kaj-Erik Monten ("Monten") met with SMSC president, Irvin Zitterkopf ("Zitterkopf"), on April 14, 1993. (DTX 66) (Plf's LR 56.1(b)(3) Resp. on §102(b), ¶ 25). During the April 1993 meeting, the inventors discussed with Zitterkopf a diagram called

"Enclosure 2." (Monten Dep. 179.) SMSC's Zitterkopf testified that he understood Enclosure 2 to be a proposal to implement a two stage separation process commercially at the Renville plant. (Zitterkopf Dep. 62-63.) As a result of that meeting, an 8 month study of the economics and details of the matters discussed was initiated.

By September 1993, inventor Hyoky concluded that a particular configuration for betaine upgrading, called "M9B3," was the "most promising alternative" to use at Renville. (DTX 71) (Plf's LR 56.1(b)(3) Resp. on § 102(b), ¶ 41). The M9B3 process developed into the '398 patent. (Hyoky Dep. 93-94, 206-208; Zitterkopf Dep. 79-81.)[1]

Finnsugar undertook additional studies for implementing the M9B3 process at Renville. A December 1993 Report, summarizing the results, was sent to Renville. Each element of claims 1, 7, and 9-14 "of the '398 patent is found in the M9B3 configuration depicted in the diagram in the Joint Research Report." (Defs.'LR 56(a)(3) SOF on § 102(b) ¶¶ 56-62.) Finnsugar does not dispute that "the process described in the December 1993 Report was the very same one set forth in Example 3 of the '398 patent." (Plf's LR 56.1(b)(3) Resp. on § 102(b), ¶ 48.)

Finnsugar sent a Proposed Amendment to the Finnsugar/SMSC Contract to SMSC on December 9, 1993. The Proposed Amendment contemplated the installation of "Improvements" to the SMSC facility (Plf's LR 56.1 (b)(3) Resp. on § 102 (b), ¶ 45.) The Proposed Amendment contemplated that SMSC would deliver to Finnsugar a betaine fraction produced after the installation of the Improvements that was of a higher quality than the plant was producing without

---

[1] Finnsugar denies that the M9B3 configuration was incorporated by the '398 patent. Finnsugar, however, fails to dispute the deposition testimony of either Hyoky or Zitterkopf. Additionally, it offers to expert testimony contradicting facts established by Cleary's declaration (Cleary Decl. at 5-6).

4

the installation so Improvements. (Plf's LR 56.1 (b)(3) Resp. on § 102 (b), ¶ 45.)

In January 1994, inventor Hyoky and SMSC engineer Monclin completed a final Joint Research Report. SMSC received a copy of the Report. Finnsugar admits that the January Report concluded by stating that: "we recommend that an investment is made that can handle both," the high-capacity system and the M9B3 system. (See Plf's LR 56.1(b)(3) Resp. on § 102(b), ¶ 53.)

In addition, the January Report states that "the economy of the [Renville] molasses plant can be considerably increased in two ways," one of which was to implement the "M9B3" configuration to produce an 85% pure betaine fraction. (DTX 75, at F36633, F36641; see also Zitterkopf Dep. 91-92; Monten Dep. 209-11, 215-20.) The January Report attached "detailed technical and feasibility calculations, and descriptive graphs," concerning the M9B3 proposal, and a flow chart describing the M9B3 method. (DTX 75, at F36641-42.) The Report projected an investment cost of $4.6 million and a payback time of 1.9 years for the M9B3 proposal. (Defs' Objections to Plf's LR 56.1(b)(3) Resp. on § 102(b), ¶ 52.).

An expert witness on behalf of the defendants, Dr. Michael Cleary ("Cleary") testified that "the process [in the January Report] is directed to separating components from beet molasses, which is represented by the 'M' and a box describing its composition as 61% sucrose and 5.0% betaine." (Id.) The 'M' is in "M9B3" and in "INC MOL," which is right above the box in the diagram showing the 61% sucrose/5.0% betaine composition to which Cleary refers. (DTX 75, at F36641.)

The January Report states that the proposed M9B3 process is for "[r]egrouping the present columns to include nine [hence the "M9"] for molasses separation . . ." (DTX 75, at

5

F36633); id. at F36619 ("the molasses plant"). Hyoky acknowledges that the 1/21/94 diagram shows that "the M9B3 configuration is using nine of the columns at Renville for molasses separation." (Hyoky Dep. 215-16.)

Finnsugar filed a patent application for the '398 patent on June 7, 1995. (DTX 104.) The defendants bring before this court a motion for partial summary judgment seeking invalidity of the '398 patent.

## Analysis

The plaintiff presently submits its motion for reconsideration the following bases: (1) Finnsugar's actions do not establish a "commercial offer for sale" under the standard recently established by the Federal Circuit in Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041(Fed. Cir. 2001); (2) genuine issues of fact prevent this court from concluding that "experimental use" was not a legitimate exception to the on sale bar in this case; (3) genuine issues of material fact as to whether the invention of the '398 patent was ready for patenting. For the following reasons, the plaintiff's motion for reconsideration is denied.

### A. The Group One Decision

The plaintiff contends that this court's Order, holding that the '398 patent violated the "on sale" bar of the Patent Act, 35 U.S.C. § 102(b), should be reconsidered in view of the Federal Circuit's Group One decision..

Section 102(b) of the Patent Act of 1952 provides that no person is entitled to patent an "invention" that has been "on sale" more than one year before filing a patent application.[2] Pfaff v.

---

[2]"A person shall be entitled to a patent unless--

"(b) the invention was patented or described in a printed publication in this or a foreign

6

Wells Electronics, Inc., 525 U.S. 55, 56 (1998). The "on sale" question "is ultimately a conclusion of law [and] review[ed] de novo, although it is based on underlying facts." Evans Cooling Sys. v GM Corp., 125 F.3d 1448, 1450 (Fed. Cir. 1997). On June 15, 2001, the Federal Circuit issued a decision in Group One, Ltd v. Hallmark Cards, Inc., 254 F.3d 1041 (Fed.Cir. 2001). In Group One, a patentee sued for infringement of patents for a machine and method for producing curled and shredded ribbon for decorative packaging, and for misappropriation of trade secrets, and alleged infringer counterclaimed for a declaratory judgment of invalidity. Ruling on summary judgment, the district court found that while Group One's communications with Hallmark prior to the critical date did not add up to a commercial offer to sell the invention, Group One's interactions did constitute an offer for sale under the formulation established in RCA Corp. v. Data General Corp., 887 F.2d 1056, 12 USPQ2d 1449 (Fed.Cir.1989), and therefore the patent was invalid under 35 U.S.C. § 102(b). Group One Ltd. v. Hallmark Cards, Inc., No. 97-1224-CV-W-1 (W.D.Mo. Sept. 2, 1999).

On appeal the Federal Circuit held that only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b), and therefore the district court's conclusion was incorrect as a matter of law. Group One, 254 F.3d at 1048. The Federal Circuit reasoned that the Supreme Court's decision in Pfaff v. Wells Electronics, Inc., 525 U.S. 55, 119 S.Ct. 304 (1998) "strongly suggests that the offer must meet the level of an offer for sale in the contract sense, one that would be understood as such in the commercial

---

        country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or ...." 35 U.S.C. S 102.

7

community" and that "[s]uch a reading leaves no room for activity which does not rise to the level of a formal 'offer' under contract law principles." Group One, 254 F.3d 1046-1047. With respect to its decision in RCA, the Court stated that "to the extent it was believed that something less than an offer to sell as understood in general commercial transactions was sufficient to trigger the on-sale bar, it is likely that such belief can no longer be the law." Id. at 1046.

For further guidance, the Group One Court stated "[a]s a general proposition, we will look to the Uniform Commercial Code ("UCC") to define whether, as in this case, a communication or series of communications rises to the level of a commercial offer for sale. . . [t]he UCC has been recognized as the general law governing the sale of goods and is another useful, though not authoritative, source in determining the ordinary commercial meaning of terms used by the parties. The Supreme Court's formulation of a 'commercial offer for sale' in Pfaff also supports consulting the UCC. The Supreme Court has also cited the Restatement of Contracts with approval in the commercial contract law context." Group One, 254 F.3d 1047-1048.

Finnsugar asserts in its Supplemental Memorandum in Support of Its Motion for Reconsideration of this Court's Decision of March 28, 2001 ("Supplemental Memorandum") that the factual findings upon which this court held that the '398 patent violates the "on sale" bar of the Patent Act, 35 U.S.C. § 102(b) do not satisfy the new threshold of that which constitutes an "offer for sale" established by the Group One decision.

The Group One decision directs courts to "look to the Uniform Commercial Code ("UCC") to define whether ... a communication or series of communications rises to the level of a commercial offer for sale." Id. at 1047. Unfortunately, the Uniform Commercial Code "does not define 'offer,' and courts must resort to extra-Code contract law via [§ ] 1-103 to determine

8

whether a party has made an offer." 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 1-4 (4th ed.1995).

Various sources define an that which constitutes an "offer" similarly. The Restatement of Contracts defines an offer as a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981). Another influential source, Corbin on Contracts, defines an offer as "an expression by one party of assent to certain definite terms, provided that the other party involved in the bargaining transaction will likewise express assent to the same terms." ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1.11 (1964). Yet another treatise, Williston on Contracts, defines an offer as "a conditional promise dependent for its enforceability on the offeree giving in exchange the offeror's requested act, forbearance or return promise; or alternatively, the offeror's manifestation of willingness to enter into a proposed bargain communicated in such a manner that the offeree may understand that by assenting the bargain will be concluded." SAMUEL WILLISTON, WILLISTON ON CONTRACTS § 4:4 (4th ed.1990). The question is whether the putative offeree could have accepted the offer. See RESTATEMENT (SECOND) OF CONTRACTS § 24 cmt. a, Reporter's Note ("[T]he key concept involves giving the addressee the apparent power to conclude a contract without further action by the other party ....") (citations omitted); CORBIN ON CONTRACTS § 1.11 ("[T]he best short description ... is that an offer creates a power of acceptance in the offeree. With respect to the resulting legal relations, offer an acceptance may be defined thus: An offer is an act whereby one person gives to another the legal power of creating the relation called contract. An acceptance is the exercise of the power conferred by the offer, by the performance of some

9

other act or acts."); E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.3 (2d ed. 1998) ("Empowerment of the offeree to make the offeror's promise enforceable is thus the essence of an offer."). Cf. Zacharin v. United States, 213 F.3d 1366, 1370 (Fed.Cir.2000) ("A sale is 'a contract between parties to give and pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold." ').

The question of whether the putative offeree could have accepted the proposal is viewed from an objective perspective. See CORBIN ON CONTRACTS § 1.11 (noting that in order to constitute a legal offer, the expression of the offeror "must be an act that leads the offeree reasonably to believe that a power to create a contract is conferred"); FARNSWORTH ON CONTRACTS § 3.10 ("Conduct that would lead a reasonable person in the other party's position to infer a promise in return for performance or promise may amount to an offer."). In order to constitute an offer, the proposal must contain all of the essential terms of the proposed agreement. See CORBIN ON CONTRACTS § 1.11 ("In order to be legally operative and to create a power of acceptance, it is necessary that the offer shall contain all the terms of the contract to be made."); WILLISTON ON CONTRACTS § 4:4 ("[A]n offer must state with the same certainty the act or promise which the offeror agrees to take in return for his promise if the offeree accepts."); FARNSWORTH ON CONTRACTS § 3.3 ("The fact that a proposal is very detailed suggests that it is an offer, while omission of many terms suggests that it is not.").

Stated differently, the relevant issue in this case, following the Group One decision, is whether Finnsugar's proposals would have led a reasonable recipient to conclude that it had the power to accept the proposal in question, and whether all of the essential terms of the agreement were included.

10

In this court's view, as stated in its original Order, SMSC reasonably believed that it had the power to accept the December 1993 Amendment, and all the terms therein, as proposed by Finnsugar.. The nine-page Amendment was presented on Finnsugar letterhead and was sent from inventor Monten with a Finnsugar fax machine to SMSC President Zitterkopf on December 9, 1993. The 1993 Amendment contemplated the installation of "Improvements" to the SMSC facility. Inventor Hyoky testified that the "Improvements" in the Proposed Amendment referred to the M9B3 configuration. Finnsugar neither disputes this fact nor suggests that the "Improvements" contemplated something other than the M9B3 configuration. The 1993 Amendment contemplated that SMSC would deliver to Finnsugar a betaine fraction produced after the installation of the Improvements (that is, the installation of the M9B3 process) that was of a higher quality than the plant was producing without the installation of the Improvements. In January 1994, inventor Hyoky and SMSC engineer Monclin completed a final joint research report assessing the implementation of the M9B3 process at Renville. SMSC received a copy of the Report. The Report attached "detailed technical and feasibility calculations, and descriptive graphs," concerning the M9B3 proposal, and a flow chart describing the M9B3 method. The January Report concluded by stating that: "we recommend that an investment is made that can handle both, the high-capacity system and the M9B3 system." The Report projected an investment cost of $4.6 million and a payback time of 1.9 years for the M9B3 proposal. On March 4, 1994, Zitterkopf, in a letter, rejected Finnsugar's proposals to upgrade the betaine fraction at the plant. He wrote: "I believe there are basic design problems within this plant that are beyond correcting by 'fine tuning' and because of the marginal performance, and the many unknowns still present, I don't believe it to be prudent at this time for SMSC to enter into a project (Finnsugar

11

proposal) designed primarily for upgrading the betaine fraction."

These facts, including specific language contained in the 1993 Amendment, demonstrate with clear and convincing evidence that SMSC, as the offeree, had the power to accept the terms of the Amendment and enforce them against Finnsugar. Therefore, the December 1993 Amendment constituted a valid offer for the purposes of § 102(b).

The plaintiff argues in its Supplemental Memorandum that it did not make a commercial offer for sale because of the following reasons: (1) Finnsugar did not offer to sell the process; (2) Finnsugar did not offer to install the process; and finally, (3) Finnsugar could not have sold the M9B3 process to SMSC because SMSC already had a license to use said process under the 1989 Agreement.

Finnsugar contends that SMSC already had under the 1989 Agreement rights to any "inventions" arising out of the joint research project. Further, Finnsugar asserts that even if Finnsugar had explicitly offered to license the M9B3 process, such an action would not constitute an offer for sale because Finnsugar had a right under the 1989 Agreement to purchase betaine, so the installation of the M9B3 process would not provide it with any new consideration. The 1993 Amendment, however, certainly anticipated changes to the 1989 Agreement other than the installation of the M9B3 process. For example, the 1993 Amendment included an increased length of its benefits from a fixed date to "perpetuity" and increased betaine quality it received as payment (45% to 50%). In addition, with a promised installation, Finnsugar would receive a higher quality betaine as payment in-kind for the third and fourth installment payments. (valued at $"1 million"). Each of these changes provided new consideration for the proposed 1993 Amendment.

Finally, Finnsugar relies on semantics to support its assertions that Finnsugar neither offered to "sell" nor "install" the M9B3 process to SMSC by way of the Joint Research Report. As noted by the defendant, the January Report was compiled in the context of the 1993 Amendment which had already been proposed by Finnsugar. Consequently, while the January Research Report, in and of itself, may not have constituted an offer to "sell" or "install" the M9B3 process, it certainly addressed the feasibility of the proposed 1993 Amendment.

Therefore, even in viewing the evidence in a light most favorable to the non-movant, this court affirms its decision in the original order and finds that the '398 patent violated the "on sale" bar of the Patent Act, 35 U.S.C. § 102(b).

**B. Experimental Use**

The plaintiff argues that genuine issues of material fact preclude rejection of Finnsugar's contention that its communications with SMSC were all made in the context of experimentation, and thus do not constitute an offer for sale. This court disagrees.

This court's original Order stated the following with respect to plaintiff's "experimental use" argument in its response to the defendant's motion for summary judgement:

> [B]oth the Supreme Court and the Federal Circuit have rejected the "experimental stage" doctrine, whereby a patentee may avoid invalidity under the on sale bar by coming forward with evidence that its use of invention was experimental, where the commercial exploitation was not incidental to the primary purpose of experimentation. City of Elizabeth v. American Nicholson Pavement Co., 97 U.S. (7 Otto) 126, 24 L.Ed. 1000 (1877); Scaltech v. Retec/Tetra L.L.C., 178 F.3d 1378 (Fed. Cir. 1999); Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc., 984 F.2d 1182, 1185, 25 USPQ2d 1561, 1563 (Fed.Cir.1993).

Order, at pgs. 9-10. This court further explained that the Supreme Court's decision in Pfaff v. Wells Electronics, Inc., 525 U.S. 55, 61 (1998) replaced the old "totality of the circumstances"

13

test that had been used to decide "experimental use" issues under § 102(b) issues a new two-part test: (1) whether the invention "was the subject of a commercial offer for sale" and (2) whether it was "ready for patenting" before the critical date. Id at 62. See Braessler, U.S.A. I, L.P. v. Stryker Sales Corp., 182 F.3d 888, 889-890 (Fed. Cir. 1999)(holding that on sale bar applied where patent was developed by joint developers but existed as separate corporate entities). Cf. Continental Can Co. USA v. Monsanto Co., Hoover Universal, Inc., 948 F.2d 1264, 1269 (Fed. Cir. 1991)(using a "totality of the circumstances" test to find that "the 'on sale' bar of 102(b) does not arise simply because the intended customer was participating in development and testing); Mass-Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1217 (Fed Cir. 1988)(same).

Finnsugar argues, however, that the post-Pfaff law surrounding § 102(b) provides that evidence that the public use or sale of a patented device was primarily experimental may negate an assertion of invalidity. In support of this proposition, Finnsugar relies on the Federal Circuit's decision in Monon Corp. v. Rosby Corp., 239 F.3d 1253 (Fed. Cir. 2001). In Monon, the inventor had designed a trailer that could accommodate a larger load than prior art trailer by eliminating side posts and substituting thicker sidewalls. More than a year before the critical date, Monon sold one trailer to Continental, a trucking company, with the intent that Continental would order an additional 300 trailers "once the trailer's durability had been proven in actual, normal use in Continental's fleet of tractor-trailers. Id. at 1256. The inventor claimed that the sale was primarily for experimental purposes. The district court disagreed, and granted a motion for summary judgement of invalidity finding that the inventor had placed the invention on sale more than a year before the patent application was filed.

On appeal, the Federal Circuit stated that "[a] showing that a patentee has publicly used or

14

sold its device prior to the critical date does not necessarily trigger the on-sale bar. Rather, evidence that the public use or sale of the patented device was primarily experimental may negate an assertion of invalidity." Id. at 1057. In finding that Monon had raised a genuine issue of material fact as to the first prong of the Pfaff test, the Monon Court considered whether the patentee kept control over the invention, whether records or progress reports wer made concerning the testing, the existence of a secrecy agreement between the patentee and the party performing the testing, whether the patentee received compensation for the use of the invention. Monon, 239 F.3d at 1258-1261.

More recently, in EZ Dock v. Schafer Systems, Inc., 276 F.3d 1347, 1352, 61 U.S.P.Q.2d 1289, 1289 (Fed.Cir. 2002), the Federal Circuit clarified the negation of the statutory bar due to experimental use under Pfaff:

> This court has repeatedly stressed that evidence of experimental use does not give rise to a free-standing doctrinal exception to statutory bars, but instead operates to negate application of section 102(b): [I]t is incorrect to impose on the patent owner, as the trial court in this case did, the burden of proving that a "public use" was "experimental." These are not two separable issues. It is incorrect to ask: "Was it a public use?" and then "Was it experimental?" Rather the court is faced with a single issue: Was it a public use under 102(b)?

EZ Dock, 276 F.3d at 1352 (citing TP Labs., Inc. v. Prof'l Positioners, Inc., 724 F.2d 965, 971-72, 220 USPQ 577, 582 (Fed.Cir.1984); Monon Corp. v. Stoughton Trailers Inc., 239 F.3d 1253, 1258, 57 USPQ2d 1699, 1703 (Fed.Cir.2001)).

The EZ Dock Court went on to state:

Because adequate proof of experimentation negates a statutory bar, the focus remains throughout the inquiry on application of the statutory bar itself.

This focus on the requirements for a statutory bar, however, could raise questions about the effect of the Supreme Court's recent clarifications of the standards for a statutory bar on the proof of experimentation adequate

15

> to negate the bar. . . Experimentation evidence includes "tests needed to
> convince [the inventor] that the invention is capable of performing its
> intended purpose in its intended environment.

Id. at 1351 (citing Gould Inc. v. United States, 217 Ct.Cl. 167, 579 F.2d 571, 583, 198 USPQ 156, 167 (1978); Kolmes v. World Fibers Corp., 107 F.3d 1534, 1540, 41 USPQ2d 1829, 1833 (Fed.Cir.1997) ("testing was ... required in such an environment in order to ensure that the invention would work for its intended purpose")).

Finnsugar argues that under the standards set by Monon and EZ Dock genuine issues of material fact preclude rejection of its contention that its communications with SMSC were made in the context of experimentation, and thus do not constitute and offer for sale.

While this court acknowledges that its original Order did not consider the Federal Circuit's recent opinions, this court did engage in a full analysis of the two-pronged test in Pfaff and continues to find, even under the standards established under Monon and EZ Dock, that the defendant has proven by clear and convincing evidence that the '398 patent violated the on sale bar of the Patent Act, 35 U.S.C. § 102(b).

Finnsugar continues to purport that between December 1992 and March 1994, Finnsugar and SMSC engaged in a joint research project which aimed to enhance and improve the separation technology at the Renville Plant. Finnsugar argues that the Joint Research Report of January 1994 is substantial evidence that the communications were for experimental purposes. If the Joint Research Report stood alone, perhaps Finnsugar's argument would be more tenable. In truth, however, the 1994 Joint Research Report occurred as the result of the 1993 Amendment proposed by Finnsugar to SMSC in which Finnsugar sought to amend the original 1989 Agreement in order to account for changes based on the installation of "Improvements" at the Renville Plant.

This facts in the present case are distinguishable from the facts in <u>Monon</u>. In this case, unlike in <u>Monon</u>, Finnsugar sought to employ a process (albeit new process) that immediately changed already existing obligations between itself and SMSC for the purpose of commercial gain without any intimation that such an attempt to install the process was simply experimental and if did not work SMSC was not liable for the designated output. The plaintiff in <u>Monon</u> sold one trailer to Continental and proceeded to see if Continental would choose to order more based on the trailer's performance. In this case, Finnsugar produced the 1993 Amendment, anticipating the installation and the process, with the intent of binding SMSC to the conditions in the contract. SMSC understood that it had the power to accept the terms of the Amendment and enforce them against Finnsugar. This does not qualify as experimental use as contemplated by <u>Monon</u> and <u>EZ Dock</u>.

Given the presence of the 1993 Amendment, this court concludes that the defendant has esablished by clear and convincing evidence that the '398 patent violated the "on sale" bar of the Patent Act, 35 U.S.C. § 102(b).[3]

### C. Ready For Patenting

Lastly, Finnsugar argues that there is a jury issue as to whether the invention of the '398 patent was ready for patenting. This court disagrees.

Motions for reconsideration serve a "limited function: to correct manifest errors of law or fact or to present newly discovered evidence." <u>Keene Corp. v. International Fidelity Ins. Co.</u>, 561

---

[3] Finnsugar also argues that the USPTO issuance of Patent No. 6,214,125 B1 ("125 patent"), which was a continuation of the '398 patent, raises a genuine issue of material fact on all issues. Finnsugar, however, provides no authority for its proposition that such issuance is strong evidence that the joint research project by Finnsugar and SMSC did not result in an "offer for sale" under the Patent Act. Consequently, this court finds Finnsugar's argument rhetorical.

17

F.Supp. 656, 665-66 (N.D.Ill.1982), aff'd 736 F.2d 388 (7th Cir.1988). Accordingly, a court will entertain a motion for reconsideration only where "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1191 (7th Cir.1990) (quoting Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D.Va.1983)).

In this case, Finnsugar's argument merely rehashes old contentions rather than addressing manifest error of law or fact or newly discovered evidence. Consequently, this court will not allow Finnsugar to reargue a position that it has already had ample opportunity to discuss.

## Conclusion

For the foregoing reasons, the plaintiff's motion for reconsideration, or in the alternative to certify the issue for appeal, is hereby DENIED.

**Enter:**

_/s/ David H. Coar_

**David H. Coar**

**United States District Judge**

**Dated:** March 25, 2002